# In the United States Court of Federal Claims

No.  12-622C

(Filed Under Seal:  December 21, 2012)

Reissued:  January 14, 2013[1]

_____

| | |
|---|---|
| LABORATORY CORP. OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>     Defendant. | * Pre-award bid protest; Cross-motions for<br>* judgment on the administrative record;<br>* Standard of review – *Bannum*; Spoliation –<br>* GSA's failure to maintain full record of<br>* procurement; Sanction imposed; Website<br>* information not incorporated into<br>* solicitation; *Blue & Gold Fleet*; Plaintiff did<br>* not waive claim that offer was timely; No<br>* patent ambiguity; Agency refusal to accept<br>* proposal was arbitrary, capricious and<br>* contrary to law; Injunction issued.<br>* |

_____

## OPINION

_____

*David E. Frulla*, Kelley, Drye & Warren, LLP, Washington, D.C., for plaintiff.

*James R. Sweet*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

> *"'If you knew Time as well as I do,' said the Hatter,*
> *'you wouldn't talk about wasting IT.  It's HIM.'"*
>
> *"'I don't know what you mean,' said Alice."*
>
> *"'Of course, you don't,' the Hatter said, tossing his head contemptuously.*
> *'I dare say you never even spoke to Time!'"*

_____

[1]  An unredacted version of this opinion was issued under seal on December 21, 2012. The parties were given an opportunity to propose redactions, but no such proposals were made. Nonetheless, the court has incorporated some minor changes into this opinion.

*'"Perhaps not,' Alice cautiously replied:*
*'but I know I have to beat time when I learn music.'"*

*'"Ah! that accounts for it,' said the Hatter.   'He won't stand beating.*
*Now, if you only kept on good terms with him, he'd do almost anything you liked with the clock.*
*For instance, suppose it were nine o'clock in the morning, just time to begin lessons:*
*you'd only have to whisper a hint to Time, and round goes the clock in a twinkling!*
*Half-past one, time for dinner!'"*[2]

Defendant, regrettably, has injected an Alice-in-Wonderland quality into this preaward bid protest case.  In this case, Laboratory Corporation of America (LabCorp) protests the refusal of the U.S. Department of Veterans Affairs (the VA) to accept its quotation for a blanket purchase agreement.  According to the solicitation, the quotation was due on May 31, 2012, at 2:00 p.m. Central Standard Time (CST), which both parties took to mean 2:00 p.m. Central Daylight Time (CDT).[3]  As instructed by an amendment to the solicitation, plaintiff loaded its quotation onto the U.S. General Services Administration's e-Buy website.  At 1:03 p.m. CDT, a LabCorp employee hit the "continue" button on the website, only to receive a message that that the submission had been refused because the website was programmed to accept offers only until 2:00 p.m. Eastern Daylight Time (EDT).

In arguments worthy of the Mad Hatter, defendant now admits (begrudgingly) that the VA made a mistake – that the contracting officer never intended to adjust the time for submitting proposals when he filed the amendment to the solicitation.  Nevertheless, the proposal was still properly refused, defendant contends, because, whether the contracting officer intended to or not, the amendment incorporated the website into the solicitation, which, according to defendant, displayed the time for submitting the proposals as 2:00 p.m. EDT.  Hence, according to defendant, the quotation was late.  Now, in fact, we do not know what LabCorp actually saw because the data corresponding to that webpage was automatically purged by the e-Buy website immediately after the closing of the procurement.  True, LabCorp admits to seeing the time on its screen.  But, it also indicates that, in the early afternoon of the day on which the procurement closed, it contacted the contracting officer to point out the problem with the time listed on the website, and was told that the proposals were due at the time listed in the solicitation, *i.e.*, 2:00 p.m. CDT.  Despite this communication, defendant argues that LabCorp waived its objections regarding the timeliness of its quotation because it failed effectively to object to what defendant views as a patent ambiguity stemming from the difference between the deadline in the solicitation and the time listed on the webpage LabCorp saw.

---

[2]  Lewis Carroll, Alice's Adventures in Wonderland 101-02 (Lee and Shepard 1869) (hereinafter "Alice in Wonderland").

[3]  The explanation of this seeming anomaly is provided below.

Fortunately, unlike the Mad Hatter's unsolvable riddle for Alice ("Why is a raven like a writing desk?"),[4] the solution to defendant's contorted arguments is readily found in the Federal Acquisition Regulations and binding precedent. Both establish that the VA's refusal to accept plaintiff's quotation here was arbitrary, capricious, and contrary to law. For the reasons that follow, the court **GRANTS** plaintiff's motion for judgment on the administrative record and **DENIES** defendant's cross-motion for judgment on the administrative record. An appropriate injunction is entered.

## I.      BACKGROUND

The administrative record in this case reveals the following:

On May 1, 2012, the VA issued Solicitation VA255-12-Q-0268 (solicitation or RFQ) for establishing a Blanket Purchase Agreement to provide laboratory testing services to the Veteran Integrated Services Network's fifteen medical centers located in Kansas, Missouri, and Illinois. The solicitation described the due date for submitting a quotation in a box which indicated: "OFFER DUE DATE/LOCAL TIME 05-31-2012 2:00 pm CST."[5] It said that offers would be submitted to a VA Contracting Office in Leavenworth, Kansas, but did not specify a method for submitting an offer. The VA posted the solicitation on the e-Buy website run by the General Services Administration (GSA).

On May 17, 2012, the VA amended the solicitation via Amendment P00001. The amendment indicated that "[t]he hour and date specified for receipt of Offers . . . is not extended." An addendum to the amendment provided answers to questions that had been submitted by potential offerors. One of the questions was "[s]hould proposals be uploaded in the GSA e-Buy system or submitted via email?," to which the contracting officer responded that "[s]ubmission through GSA e-Buy is required." A second question posed was "[d]oes VISN 15 require a hard copy of all signed documents?," to which the contracting officer responded, "VISN 15 will only accept documents through e-Buy." All told, the addendum to the amendment answered eight questions.

On May 31, 2012, at 11:30 a.m. CDT, Stephen Harbaugh, a contracting specialist for LabCorp, began to upload the company's offer onto e-Buy. At this point, he noticed, for the first time, that the e-Buy website listed the closing time for receipt of proposals as 2:00 p.m. EDT. Mr. Harbaugh experienced technical difficulties in trying to upload the offer, and, at approximately 12:10 p.m. CDT, called Sean Jackson, the contracting officer at the VA. The two discussed the fact that the e-Buy system listed the bid closing time as 2:00 p.m. EDT. Mr.

---

[4]  *Alice in Wonderland, supra*, at 7.

[5]  For reasons unexplained, the solicitation set the May deadline using Central Standard Time, even though Central Daylight Time, which was the "local time" in Leavenworth, Kansas, began on March 11, 2012. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005). The parties have stipulated, however, that they always believed that the solicitation should be read to refer to 2:00 pm CDT.

Jackson confirmed that he was located in the Central Time Zone and that the bid was due at 2:00 p.m. CDT that day.[6]

Notwithstanding Mr. Jackson's representation, at 1:00 p.m. CDT (2:00 p.m. EDT), e-Buy shut down the bidding system for this solicitation.  At 1:03 p.m. CDT, Michelle Ballentine (another LabCorp employee who had been enlisted to help upload the bid) completed uploading all of the files constituting the offer to e-Buy, and then clicked "continue" on the e-Buy screen. She received a message from e-Buy stating "Sorry, the RFQ closed on Thursday, May 31, 2012 at 2:00PM.  No additional quotes can be accepted at this time."  At 1:02 p.m. CDT, Mr. Jackson received an email generated by the e-Buy website indicating that "Subject RFQ for [VISN 15] is now closed.  2 quotes were received.  To view and evaluate quotes, please login at www.e-Buy.gsa.gov."  Shortly before 1:10 p.m. CDT, Mr. Harbaugh called Mr. Jackson at the VA and left him a voicemail explaining that e-Buy had closed the procurement prematurely and asking that LabCorp be allowed to submit its proposal by alternative means.  Within a few hours, a follow-up email was sent to Mr. Jackson with a similar request.  The following day, June 1, 2012, after receiving another email from another member of the LabCorp team, Mr. Jackson finally responded via email:  "I will have to consult our legal department.  It will be next week at the earliest before I can respond to your request."

On June 11, 2012, LabCorp filed a pre-award protest with the GAO challenging the closure of bidding at 1:00 p.m. CDT.  On September 13, 2012, the GAO dismissed the protest as untimely, deciding that LabCorp should have protested what GAO deemed to be a patent ambiguity in the solicitation before the deadline for receipt of proposals.

LabCorp filed this bid protest on September 20, 2012.  On September 28, 2012, defendant filed the administrative record.  On September 28, 2012, defendant filed the administrative record.  The record did not include copies of the webpages that LabCorp saw during the procurement process.  In lieu thereof, defendant included:  (i) a declaration and supplemental declaration made by Mr. Harbaugh during the GAO protest; and (ii) a declaration made by Gill Machen, the GSA e-Buy program manager.  Mr. Harbaugh's supplemental declaration stated that "after the close of an RFQ, on e-Buy, there is no way to retrieve or recreate a screen shot of the particular page a contractor would have seen for that RFQ.  GSA does not archive that information."  Mr. Harbaugh attached to his declaration screen shots based on generic e-Buy "test scenarios," a computer log of access to the RFQ file in

_____

[6] Plaintiff has submitted a supplemental declaration from Mr. Harbaugh to this effect, which was corroborated by a copy of Mr. Harbaugh's contemporaneous notes of the conversation.  Defendant submitted a declaration filed with the General Accountability Office (GAO) in which Mr. Jackson admitted that a conversation occurred between him and a LabCorp representative on the day in question.  In that declaration, Mr. Jackson does not deny that he informed plaintiff to comply with the deadline in the solicitation.  An email in the record, sent by a VA official to plaintiff's counsel, indicates that "Mr. Jackson has no information to refute Mr. Harbaugh's statement."  Under these circumstances, the court credits plaintiff's declaration.

question in May of 2012, and code-based logs of emails sent from e-Buy to LabCorp during May 2012.[7]

On October 5, 2012, plaintiff filed a motion for judgment on the administrative record; on October 19, 2012, defendant filed a cross-motion for judgment on the administrative record. During briefing on these cross-motions, the court ordered additional briefing on whether defendant had spoliated evidence in the case. All briefing was completed by November 14, 2012. On November 19, 2012, the court heard oral argument. Per this court's order, on November 28, 2012, defendant submitted an additional declaration from Mr. Machen, stating that the "Government did not have administrative rights allowing it to capture a screen shot of the images displayed on a particular vendor's e-Buy website at a particular time, unless that vendor provided its credential to the GSA."

## II.    DISCUSSION

Before turning, in detail, to plaintiff's claims, we begin with common ground.

### A.    Standard of Review

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record. *Id.* at 1356. The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full-blown evidentiary proceeding. *Id.*; *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005). Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1354; *see also NEQ, LLC v. United States*, 88 Fed. Cl. 38, 46 (2009); *Int'l Outsourcing*, 69 Fed. Cl. at 46; *Carlisle v. United States*, 66 Fed. Cl. 627, 631 (2005).

*Bannum*'s approach reflects well the limited nature of the review conducted in bid protests. In such cases, this court will enjoin defendant only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final

---

[7]  At oral argument, defendant's counsel essentially acknowledged that the emails referenced in these logs also had not been retained by the e-Buy website and that the log was the only evidence of what had been sent. The logs themselves contain only cryptic details, insufficient to allow the court to recreate, completely, the content of the emails.

decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003); *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 396 n.7 (2003). As the focus of this standard is more on the reasonableness of the agency's result than on its correctness, the court must restrain itself from examining information that was not available to the agency. Failing to do so, the Federal Circuit has observed, risks converting arbitrary and capricious review into a subtle form of *de novo* review. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379–80 (Fed. Cir. 2009).[8] At all events, this court will interfere with the government procurement process "only in extremely limited circumstances." *C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983) (quoting *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983)).

The aggrieved bidder must demonstrate that the challenged agency decision was either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004), *aff'g*, 56 Fed. Cl. 377, 380 (2003); *see also ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 201 (2007). Moreover, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).[9] "Finally, because injunctive relief is relatively drastic in nature, a

---

[8]   In *Axiom*, the Federal Circuit noted that the "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" 564 F.3d at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). In forceful terms, the Federal Circuit rejected the lenient approach to the use of extra-record evidence reflected in *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), noting that the latter decision: (i) "departs from fundamental principles of administrative law as articulated by the Supreme Court;" (ii) has "questionable" vitality "even within the D.C. Circuit . . . in light of more recent opinions by that court which demonstrate a more restrictive approach to extra-record evidence;" and (iii) at all events, "is not the law of this circuit." *Axiom*, 564 F.3d at 1380-81. As this court has subsequently noted, "[w]hile *Axiom* undoubtedly permits limited supplementation of the record with evidence that does not involve the agency's procurement decision (*e.g.*, evidence as to whether a plaintiff would experience irreparable harm), it makes clear that any court in this circuit that relies upon *Esch* to supplement the administrative record more broadly does so at peril of reversal." *NEQ*, 88 Fed. Cl. at 47 n.6.

[9]   A review of Federal Circuit cases indicates that this prejudice analysis actually comes in two varieties. The first is that described above – namely, the ultimate requirement that a protestor must show prejudice in order to merit relief. A second prejudice analysis is more in the nature of a standing inquiry. In this regard, the Federal Circuit has held that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002); *Overstreet Elec. Co., Inc. v. United States*, 59 Fed. Cl. 99, 109 n.5 (2003). Cases construing this second variation on the prejudice inquiry have held

plaintiff must demonstrate that its right to such relief is clear." *NEQ*, 88 Fed. Cl. at 47; *see also Banknote*, 56 Fed. Cl. at 380-81; *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 566 (2000).

**B.      Spoliation – GSA's Failure to Maintain a Full Record of the Procurement**

It appears that evidence relevant to this case was destroyed when the e-Buy website automatically purged the data that would have allowed GSA to recreate the webpages seen by LabCorp at critical points during the procurement in question.  In briefing this case, defendant chose to emphasize the information that was on these webpages, in arguing that the VA properly rejected plaintiff's quotation.  Defendant did so even after being warned by the court that such arguments would raise serious questions regarding the spoliation of evidence.  The court must now consider those questions.

"'Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'"  *United Med. Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 263 (2007) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).  Spoliation may result in a variety of sanctions, with "the oldest and most venerable remedy" being an "adverse inference," under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side.  Jonathan Judge, "Reconsidering Spoliation:  Common-Sense Alternatives to the Spoliation Tort," 2001 Wis. L.Rev. 441, 444 (2001); *see also* Jamie S. Gorelick, Stephen Marzen, Lawrence Solum & Arthur Best, Destruction of Evidence § 1.3 (1989 & Supp. 2012) (hereinafter "Gorelick").

In the Federal system, spoliation sanctions spring from two main sources of authority.  First, sanctions may be based on the court's inherent power to control the judicial process and litigation, a power that is necessary to redress conduct "which abuses the judicial process."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process); *see also Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1474-75 (D.C. Cir. 1995); *see generally Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65 (1980).  Although established under Article I of the Constitution, this court, no less than any Article III tribunal, possesses this form of inherent authority.  *See United Med. Supply Co. v. United States*, 73 Fed. Cl. 35, 36 (2006);

---

that it requires merely a "viable allegation of agency wrong doing," with "'viability' here turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true."  *McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 721 (2007); *see also 210 Earll, L.L.C. v. United States*, 77 Fed. Cl. 710, 718-19 (2006); *Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284-85 (2006).  This "viability" standard is reminiscent of the "plausibility" standard enunciated in several recent Supreme Court cases.  *See Dobyns v. United States*, 91 Fed. Cl. 412, 422-26 (2010) (discussing the "plausibility standard" of pleading drawn from *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  Because of the nature of the allegations of error here, the court is convinced that plaintiff has met this preliminary "standing" threshold.

*Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 136 (2004).[10]  Second, where the spoliation violates a specific court order or disrupts the court's discovery regime, sanctions also may be imposed under Federal Rule of Civil Procedure 37, which is essentially identical to its counterpart under this court's rules.  *See* RCFC 37; *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-43 (1976).  "In either instance, the policies underlying the sanctions are multifaceted:  to punish the spoliator, so as to ensure that it does not benefit from its misdeeds; to deter future misconduct; to remedy, or at least minimize, the evidentiary or financial damages caused by the spoliation; and last, but not least, to preserve the integrity of the judicial process and its truth-seeking function."  *United Med. Supply*, 77 Fed. Cl. at 264; *see also West*, 167 F.3d at 779; Gorelick, *supra*, at § 3.14; *see generally*, *Nat'l Hockey League*, 427 U.S. at 643.

In keeping with these broad rationales, courts have held that, like any other litigant, the United States is subject to spoliation sanctions either under the court's inherent authority or the sanction provisions of Rule 37.  *See, e.g.*, *M.A. Mortenson Co. v. United States*, 996 F.2d 1177, 1183-84 (Fed. Cir. 1993) (citing additional cases); *see also Chilcutt v. United States*, 4 F.3d 1313, 1325-26 (5th Cir. 1993), *cert. denied, sub nom.*, *Means v. Wortham*, 513 U.S. 979 (1994); *United States v. Nat'l Med. Enters., Inc.*, 792 F.2d 906, 912-13 (9th Cir. 1986); *K-Con Bldg. Sys., Inc. v. United States*, 2012 WL 3744672, at *9-13 (Fed. Cl. Aug. 30, 2012).[11]  While it is debatable whether, absent some order authorizing discovery, sanctions under RCFC 37 are directly available in a bid protest action, *cf. Pyramid Real Estate Servs., LLC v. United States*, 95 Fed. Cl. 613, 622 (2010) (applying RCFC 37 via RCFC 16(f)), there is little question that the court may impose spoliation sanctions against defendant under its inherent authority.  And it is upon the latter basis that the court proceeds here.  Such sanctions are appropriate when "the party having control over the evidence had an obligation to preserve it at the time it was destroyed," the evidence was "destroyed with a culpable state of mind," and "the destroyed evidence was

---

[10]  The Supreme Court has held that Article I courts exercise the judicial power of the United States.  *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 889 (1991); *Williams v. United States*, 289 U.S. 553, 564-66 (1933); *see also Chambers*, 501 U.S. at 43 (courts are vested with inherent powers "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases") (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)).

[11]  Generally speaking, "when the United States comes into court as a party in a civil suit, it is subject to the Federal Rules of Civil Procedure as any other litigant."  *Mattingly v. United States*, 939 F.2d 816, 818 (9th Cir. 1991).  Further, section 205 of the original Equal Access to Justice Act, Pub. L. No. 96-481, § 205, 94 Stat. 2321, 2330 (1980), expressly repealed former subdivision (f) of Fed. R. Civ. P. 37, which had disallowed awards of expenses and attorney's fees against the United States for discovery abuses.  In the accompanying report, Congress specified that the United States is to be treated like any other litigant in awarding discovery sanctions:  "This change reflects the belief that the United States should be liable for fees the same as other parties when it abuses discovery."  H.R. Rep. No. 96-1418, at 19 (1980); *see also id.* at 9 (noting that a modification made to 28 U.S.C. 2412(b) "reflects the belief that at a minimum, the United States should be held to the same standards in litigating as private parties.").

relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support the claim or defense." *Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007); *see also K-Con Bldg. Sys.*, 2012 WL 3744672, at *10.[12]

As a preliminary matter, defendant argues that its agencies did not have a duty to preserve evidence relating to the procurement when it closed because, at that early juncture, neither the VA nor GSA could have anticipated litigation. But, the Federal Acquisition Regulations (FAR) indicate otherwise. They require procuring agencies to maintain all the contract documents associated with a procurement. Thus, FAR § 4.801(a) states that "[t]he head of each office performing contracting, contract administration, or paying functions shall establish files containing the records of all contractual actions." 48 C.F.R. § 4.801(a). The FAR lists forty-two (42) items that should "normally [be] contained" in a contract file, including "a copy of the solicitation and all amendments thereto." 48 C.F.R. §§ 4.803(a), (a)(8). Regarding this requirement, the regulations provide that this documentation must be "sufficient to constitute a complete history of the transaction for the purpose of . . . [f]urnishing essential facts in the event of litigation or congressional inquiries." 48 C.F.R. § 4.801(b)(4). In the court's view, these regulations recognize the prospect of having some form of litigation be associated with a procurement, and preclude the VA and GSA from claiming that they were under no obligation to preserve information relating to the procurement in question because they did not anticipate that the procurement would be protested.

A number of cases support this conclusion. For example, in *Pitney Bowes Gov't Solution, Inc. v. United States*, 93 Fed. Cl. 327, 335-36 (2010), this court held that a Justice Department contracting officer violated the FAR provisions quoted above when, prior to an award decision, he caused rating sheets prepared by the members of a technical evaluation panel to be destroyed. In holding that the duty to preserve evidence had attached before these sheets were destroyed, this court found that, under the regulations, "[i]t was foreseeable that the [documents destroyed by the agency] could well become relevant to issues arising in a bid protest," adding that "[n]o preternatural clairvoyance would be required to envision that possibility." *Id.* at 335.[13]  Other courts have likewise concluded that a preservation duty attaches when regulations require a government agency to maintain a specified set of records. *See DMAC, LLC v. City of Peekskill*, 2012 WL 4459290, at *2 (S.D.N.Y. Sept. 26, 2012) (holding that local government records law put city on notice that it had to retain emails); *see also Gerlich v. U.S. Dep't of Justice*, 828 F. Supp. 2d 284, 300-01 (D.D.C. 2011) (records destroyed in

---

[12]  As was noted in *K-Con Bldg. Sys.*, 2012 WL 3744672, at *10 & n.19, while the Federal Circuit enunciated the three prongs of this sanctions test in describing when an adverse inference may be applied against an offending party, the same criteria are employed in determining whether other sanctions may be imposed under this court's inherent authority.

[13]  *See also* Ralph C. Nash, "Destroying Evaluator's Worksheets:  A Bad Practice," 24 Nash & Cibinic Report ¶ 40 (2010).

violation of formal regulations requiring preservation "would likely constitute spoliation").[14] The court, therefore, finds that defendant had a duty to preserve the webpage in question, as part of the history of the procurement.

The next question is whether defendant had a culpable state of mind. While the Federal Circuit in *Micron Technology, Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1327 (Fed. Cir. 2011) recently suggested that a showing of bad faith is "normally a prerequisite to the imposition of dispositive sanctions for spoliation," that court has not clarified what level of culpability is required for the imposition of lesser sanctions, such as an adverse inference.[15] This court, in *United Medical Supply*, summarized the split among the circuits as to the degree of culpability required for various sanctions, thusly:

> There is, in fact, a division of authority among the circuits on this issue. . . . On one end of [the] spectrum, actually representing a distinct minority, are courts that require a showing of bad faith before any form of sanction is applied. Other courts expect such a showing, but only for the imposition of certain more serious sanctions, such as the application of an adverse inference or the entry of a default judgment. Further relaxing the *scienter* requirement, some courts do not require a showing of bad faith, but do require proof of purposeful, willful or intentional conduct, at least as to certain sanctions, so as not to impose sanctions based solely upon negligent conduct. On the other side of the spectrum, we find courts that do not require a showing of purposeful conduct, at all, but instead require merely that there be a showing of fault, with the degree of fault, ranging from mere negligence to bad faith, impacting the severity of the sanction. If this continuum were not complicated enough, some circuits initially appear to have adopted universal rules, only to later shade their precedents with caveats. Other times, the difference between decisions appear to be more a matter of semantics, perhaps

---

[14]  Other courts have likewise held that the violation of a regulation requiring document preservation can support an inference of spoliation. *See Talavera v. Shah*, 638 F.3d 303, 312 (D.C. Cir. 2011) (violation of U.S. Equal Employment Opportunity Commission record-retention regulation amounted to a breach of duty justifying spoliation inference); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 108-09 (2d Cir. 2001) (violation of regulations implementing Title VII and Americans with Disabilities Act supported spoliation inference); *Latimore v. Citibank Fed. Savs. Bank,*, 151 F.3d 712, 716 (7th Cir. 1998) ("The violation of a record[-]retention regulation creates a presumption that the missing record contained evidence adverse to the violator."); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994) (because employer violated record retention regulation, plaintiff was "entitled to the benefit of a presumption that the destroyed documents would have bolstered her case"); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987) (same); *see also* Steffen Nolte, "The Spoliation Tort:  An Approach to Underlying Principles," 26 St. Mary's L.J. 351, 368-69 (1995) (collecting additional cases).

[15]  *See K-Con Bldg. Sys.*, 2012 WL 3744672, at *10 n.19; *United Med. Supply*, 77 Fed. Cl. at 266; *see also Jandreau*, 492 F.3d at 1375.

> driven by state law, with some courts, for example, identifying as "bad faith"
> what others would call "recklessness" or even "gross negligence."

*United Med. Supply*, 77 Fed. Cl. at 266-67 (footnotes omitted).[16]  The court ultimately concluded, based upon "logic and considerable and growing precedent," that "an injured party need not demonstrate bad faith in order for the court to impose, under its inherent authority, spoliation sanctions." *Id*. at 268.  Thus, the degree of culpability, as well as the harm caused by the loss of evidence, impacts not only whether a sanction should be imposed, but also which sanction is appropriate.  *Id.* at 270-71; *see also K-Con Bldg. Sys.*, 2012 WL 3744672, at *12; *Cencast Servs., L.P. v. United State*s, 94 Fed. Cl. 425, 444 (2010).  "Under this balancing approach, there are no bright lines, at least in terms of *mens rea*, with the focus instead being on effectively addressing overall, the spoliation conduct, as well as the harm it engendered."  *United Med. Supply*, 77 Fed. Cl. at 270-71; *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 529 (D. Md. 2010) (Grimm, M.J.).

Defendant's failure to preserve the information from the GSA website amounts to "negligence," or "'culpable carelessness,'" that is, "'[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation[.]'"  *Victory Stanley*, 269 F.R.D. at 529 (quoting Black's Law Dictionary 846 (Bryan A. Garner ed., abridged 7th ed., West 2000)).  Part of the difficulty in assessing the degree of culpability here stems from defendant's shifting positions as to what the website represented.  If, as defendant argues, the website (or a portion thereof) was part of the solicitation, then it would appear that the agency's failure to maintain a copy of the webpage that plaintiff saw would amount to gross negligence (or worse), given not only the FAR's general instruction to preserve a "complete history of the transaction for the purpose of . . . [f]urnishing essential facts in the event of litigation,"  48 C.F.R. § 4.801(b)(4), but also its very specific instruction to preserve "a copy of the solicitation and all amendments thereto."  *Id*. at § 4.803(a)(8).  However, as will be discussed in greater detail below, the court believes neither that the webpage constituted part of the solicitation, nor that any of the agency officials involved here remotely believed so.  Rather, the court finds – and it appears that the agency officials all believed – that the website constituted nothing more than the means for submitting a proposal.  In the court's view, this still means that defendant was required to preserve the data relating to the website.  But, it becomes more understandable why the VA and GSA did not realize that this was the case, making their failure to do so, in the court's eyes, less culpable, *i.e.*, only negligent.[17]

_____

[16]  *See also* the Sedona Conference, *The Sedona Conference Glossary: E-Discovery & Digital Information Management* 48 (3d ed. 2010), available at https://thesedonaconference.org/download-pub/471.

[17]  In *Park v. City of Chicago*, 297 F.3d 606, 615-17 (7th Cir. 2002), the Seventh Circuit noted that an employer's violation of a record retention regulation creates a presumption that the missing record contained evidence adverse to the violator, but cautioned that this presumption would not apply to an inadvertent failure to comply with the regulation.  In light of this distinction, the court believes that an agency that fails to maintain a copy of a document constituting part of a solicitation is potentially more deserving of a sanction than one that

The court rejects, as untenable, defendant's claim that plaintiff was required to maintain copies of the screen shots it saw and thus was equally culpable in failing to maintain them. Courts presented with similar "pass the buck" arguments have refused to shift the burden of production away from the entity that controls a website. *See, e.g.*, *Katiroll Co., Inc. v. Kati Roll and Platters, Inc.*, 2011 WL 3583408, at *4 (D.N.J. Aug. 3, 2011); *Ferron v. Metareward, Inc.*, 698 F. Supp. 2d 992, 1002 (S.D. Oh. 2010).[18]   Nor does it make any sense to suggest, as defendant has, that the VA and GSA are not culpable because GSA's design of the website and document retention policy were adopted in good faith and without notice of the potential relevance of the screen shots.  To be sure, an agency need not preserve every scrap of data on its servers in an extraordinary measure to preserve all potential evidence.  *See Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 431 (S.D.N.Y. 2009); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).  But, given the requirements of the FAR, a procuring agency may not escape sanctions by designing a website that automatically purges critical information the moment a procurement closes, no matter how unawares agency officials may have been regarding their preservation duties.[19]   Indeed, as has been found in analogous cases involving governmental entities and corporations, the lack of policies or procedures designed to give an agency (or other entity) the ability to effectuate, on relatively short notice, a litigation hold involving a website, provides further support for a finding of spoliation.[20]   Moreover, it should not be overlooked that defendant has failed to provide any persuasive evidence that it is either technologically or logistically infeasible for it to retain the data in question and have it be

---

inadvertently fails to retain evidence that might otherwise be viewed as constituting a lesser part of the record of the procurement.

[18]   It should be noted that the VA may not escape sanctions here on the basis that the website in question was maintained by GSA.  Courts have regularly rejected arguments that a given actor should not be held liable for the actions of its contractors or employees, where it has been shown that the website was under the control of the actor.  *See Victor Stanley*, 269 F.R.D. at 516 n.23 ("agency law is directly applicable to a spoliation motion, and the level of culpability of the agent can be imputed to the master"); *Arteria Prop. Pty. Ltd.*, 2008 WL 4513696, at *5 (D.N.J. Oct. 1, 2008).  The rationale underlying these cases, of course, resonates all the more where, as here, both agencies are part of a single entity, the United States government.

[19]   *See United Med. Supply*, 77 Fed. Cl. at 274 n.30 (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 169 F.R.D. 598, 615 (D.N.J. 1997) ("[w]hen senior management fails to establish and distribute a comprehensive document retention policy, it cannot shield itself from responsibility because of [its underlying employees] actions").

[20]   *See, e.g.*, *Keithley v. The Homestore.com., Inc.*, 2008 WL 4830752, at *7-9 (N.D. Cal. Nov. 6, 2008) (imposing sanctions based on plaintiff's destruction of relevant electronic documents because of the failure to implement a document retention policy or issue a litigation hold); *Treppel v. Biovail Corp.* 249 F.R.D. 111, 118-19 (S.D.N.Y. 2008); *Doe v. Norwalk Cmty. Coll.*, 248 F.R.D. 372, 378 (D. Conn. 2007); *In re NTL, Inc. Secs. Litig.*, 244 F.R.D. 179, 198-99 (S.D.N.Y. 2007); *see also Philip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1190-91 (D. Utah 2009).

available as evidence, at least when disputes arise.  *Cf. Arista Records*, 608 F. Supp. 2d at 432-33 & n.34.[21]

Before turning to the sanction that is appropriate here, a word about prejudice.  LabCorp seeks an adverse inference that the e-Buy website did not create a separate deadline for "uploading offers to e-Buy."  Plaintiff, however, admits that the webpage that its officials saw listed the deadline as 2:00 p.m. EST.  In the court's view, the prejudice plaintiff has experienced involves its inability to analyze this information in the context of the webpage on which it was displayed, and to point to other features of the website, including modifications made on the relevant webpages over time, that might contradict defendant's claim that any particular information on the webpage was incorporated into the solicitation.[22]  Because defendant did not maintain the data associated with plaintiff's webpage, moreover, plaintiff is unable to respond fully to the secondary evidence provided by defendant in support of its claim regarding what plaintiff saw, *e.g.*, log information, declarations provided by VA and GSA officials.

It is important to focus on the actual prejudice that LabCorp has experienced, as the "court should always impose the least harsh sanction that can provide an adequate remedy." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs. LLC*, 685 F. Supp. 2d 456, 469 (S.D.N.Y. 2010); *see also Micron Tech.*, 645 F.3d at 1328-29; *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 405 (W.D. Tenn. 2011).  Ultimately, the court "must construct a sanction that is just and proportionate in light of the circumstances underlying the failure to preserve relevant evidence, as well as the punitive, prophylactic, remedial and institutional purposes to be served by such sanctions."  *United Med. Supply*, 77 Fed. Cl. at 270; *see also Cencast Servs.*, 94 Fed. Cl. at 444.

Based upon these considerations, the court believes that an appropriate sanction here is to prohibit defendant from relying upon any secondary evidence regarding what plaintiff saw on the GSA website.  *See K-Con Bldg. Sys.*, 2012 WL 3744672, at *13 (imposing a similar sanction); *see also Reed v. Honeywell Int'l, Inc.*, 2009 WL 886844, at *11 (D. Ariz. Mar. 31, 2009)

---

[21]  In his declaration, Mr. Machen, the GSA employee responsible for running e-Buy, indicates that the system produces "tens of thousands of pages on a daily basis."  But, he fails to explain why the system cannot capture screen shots either once or twice a day or at other critical junctures .  (Defendant also notes that, owing to the password protocols employed, the content of the e-Buy website is not captured by systematic efforts to archive the Internet, such as that conducted by archive.org and its "Wayback Machine").  Mr. Machen also fails to explain why the agency would design a website that supposedly places critical information regarding a procurement on a webpage that is to be purged.

[22]  For example, in *Conscoop-Consorzia Fra Coop. Di Prod. E Lavoro v. United States*, 62 Fed. Cl. 219, 229-30 (2004), *aff'd*, 159 Fed. Appx. 184 (Fed. Cir. 2005), the court concluded that information on a website was not part of the solicitation because the information was listed under a heading that said "Description of the Advertised Solicitation."  The court concluded that this heading indicated that the due date listed in the description was not part of the solicitation itself.  *Id.*

-13-

(discussing this sanction, but postponing its consideration until trial). This secondary evidence includes all the sample screen shots, log information, declarations, and other indirect proof that defendant submitted in an effort to demonstrate what plaintiff's webpage looked like in the period leading up to the closing of the procurement.[23] Beyond this, the court denies, without prejudice, plaintiff's request for costs and attorney's fees to the extent they relate to the litigation of this spoliation matter.[24]

### C.      Alleged Improprieties in Refusing to Accept Proposal

So, did defendant comply with the solicitation in refusing to accept plaintiff's proposal? Before addressing this issue, the court must address two further threshold matters:  (i) defendant's contention that the website – or at least the "deadline" listed thereon – constituted part of the solicitation; and (ii) defendant's claim that the patent ambiguity/waiver doctrine prevents this court from deciding the timeliness of plaintiff's offer.

### 1.      Was the website part of the solicitation?

The original solicitation indicated that offers were "due" on May 31, 2011, at 2:00 p.m. CST.  Both parties agree that this reference should be construed to require that offers were due by 2:00 p.m. CDT, the local time in Leavenworth, Kansas, where the government office designated in the solicitation is located.  *See* 48 C.F.R. § 52.215-1(c)(3)(i) (indicating that "local time" generally refers to the time where the "Government office designated in the solicitation" is located).  Defendant argues that the amendment to the solicitation did not modify this "due" time, but instead added a second, distinct requirement to the solicitation, namely, that offers had to be submitted to e-Buy at the time specified on the website, *to wit*, 2:00 p.m. EDT.  According to defendant, then, the solicitation, as amended, had two different timing requirements – one for the submission of offers to the GSA website and a different one for when the offers were "due" to the VA.  Curiously, defendant cannot really explain why the agency would want two such deadlines, particularly since an offeror, after timely submitting its offer on the e-Buy website, could do nothing to make sure that its proposal was "timely" received by the VA.[25]  If defendant

---

[23]   To be fair, defendant filed some of these materials in response to requests made by the court for further information.  But, those requests were made in the preliminary stages of this case, before the court fully understood defendant's preservation obligations and the depth of its failure to meet those obligations.  Moreover, it should be noted that while defendant included these materials in the administrative record and various of its other filings, it never moved to supplement the record to include the latter materials.  *See Med. Matrix, LLP v. United States*, 2007 WL 5161789, at *7 n.18 (Fed. Cl. Dec. 12, 2007) (holding that materials not properly admitted into the record are not before the court).

[24]   At the appropriate time, plaintiff, of course, may file an application for such fees pursuant to 28 U.S.C. § 2412(d)(1)(A).

[25]   The best defendant can do, in terms of mustering up an explanation, is to analogize the situation here to that of using the postal service to deliver an offer.  Thus, it suggests that, in the

-14-

is right, then, the VA's contracting officer set up a second deadline via an amendment that made the due date listed in the solicitation really no deadline at all.[26]

Is this really what happened here?  The court thinks not.  For one thing, defendant proceeds from the false notion that when the amendment indicated that "[s]ubmission through GSA e-Buy is required," it incorporated into the solicitation any relevant information found on the website, including, in particular, the incorrect closing time listed for the procurement, *to wit*, 2:00 p.m. EDT.  Of course, like other contract documents, the interpretation of the amendment begins with an examination of its plain language.  *See Banknote*, 365 F.3d at 1353; *see also NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004).[27]  And there is no hint in the language of the amendment that the VA intended to incorporate information on the website into the solicitation.  Rather, the amendment merely provided "[s]ubmission through GSA e-Buy is required," the plain meaning of which in no way connotes the incorporation of any terms, let alone a critical modification of the timing provisions of the solicitation.[28]  As it turns out, the absence of any language setting up a new deadline is not surprising, as defendant now admits that the contracting officer did not intend the amendment to create two deadlines – one for submitting the proposal to the e-Buy website and another for the proposal to be received – but that he (or someone) instead simply committed an error in programming the deadline into the e-Buy website.[29]  The court cannot conceive why it ought to construe the amendment in a way that

_____

paper world, an agency might want to establish one deadline for mailing a proposal at the post office and another for when that proposal must be received by the procuring agency.  But, this analogy simply begs another question:  why would an agency have two such deadlines, rather than simply requiring an offeror to use the post office and then requiring timely receipt.  The latter scenario – specifying a means of delivery and requiring that the offer be timely received – is what plaintiff, of course, believes the solicitation required here.

[26]  "'Well! I've often seen a cat without a grin,' thought Alice; 'but a grin without a cat! It's the most curious thing I ever saw in all my life!'"  Alice in Wonderland, *supra*, at 94.

[27]  For specific cases applying this rule of construction to amendments, *see Maint. Eng'rs, Inc.*, 99-2 B.C.A. ¶ 30513 (1999); *Sual Subsidiary II Ltd. P'ship v. Gen. Servs. Admin.*, 98-2 B.C.A. ¶ 29871 (1998); *Data Switch Corp.*, 89-3 B.C.A. ¶ 22049 (1989).

[28]  Notably, the form that the VA used to file the amendment (Standard Form 30) included a pre-printed block that stated "The hour and date specified for receipt of Offers" and then had two checkboxes –  "is extended" and "is not extended."  On the amendment in question, the VA checked the latter of these two boxes.

[29]  The following colloquy between the court and government counsel occurred during the oral argument in this case:

Q:      [H]e didn't know – did he – that the website was out of sync with the solicitation?

A:      I don't think at the time he did know, no, your honor.

its language does not admit in order to give effect to an intent that the contracting officer never had. *Compare United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) ("Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstance.").

Nor will the court blithely construe the language in the amendment to incorporate, by reference, into the solicitation any material on the website. On this count, the Federal Circuit has sensibly indicated that "the language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract." *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008); *see also Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) ("To incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates that the purpose is to incorporate the referenced material . . . ."); *Teg-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1339 (Fed. Cir. 2006). Applying this rule here makes eminent sense given the VA's Acquisition Regulations, which require a contracting officer to "advise bidders or offerors of changes made to the solicitation by issuing an amendment." 48 C.F.R. § 801.602-77(b). There

| | |
|---|---|
| Q: | Which time are we talking about? |
| A: | Up til the closing – until – |
| Q: | – a until after the closing. So if you're right, at the time he made that amendment, ok, he didn't think that he was changing the timing did he? |
| A: | Your honor he thought he was requiring submission through e-Buy. And whether – |
| Q: | An hour earlier than the other deadline that was in the solicitation? That's the question. |
| A: | Your honor whether there was an error in that timing or not, it was clear to them – |
| Q: | Answer the question – did he know at the time he made the amendment that he was changing the timing of this so that the submission to eBuy would be an hour earlier than the time it had to be received under the solicitation? |
| A: | I don't believe he knew the time was an hour earlier when he changed it. |
| Q: | Alright. So. And so the first time actually he discovers either that there's a problem is when he gets a phone call or perhaps even after that. Correct? |
| A: | It's probably after that, your honor. |

Oral argument at 10:33:19 a.m. EST – 10:34:12 a.m. EST, *Lab. Corp. of Am. v. United States*, No. 12-622C (Fed. Cl. Nov. 19, 2012).

is little doubt that the amendment in question did not "explicitly, or at least precisely" identify the fact that the timing provisions of the solicitation were being modified to reflect the time listed on the webpage. *Northrop Grumman Info. Tech.*, 535 F.3d at 1345. To the extent that the amendment could be viewed as attempting to accomplish this, it was ineffective in doing so.

In this and other ways, this case parallels *Conscoop-Consorzia*, in which this court rejected a protester's claim that a website had modified the due date for offers. In that case, the solicitation stated that proposals were due 2:00 p.m., Naples, Italy time, while the agency website, through which the solicitation was distributed and accessed, indicated that proposals were due at 2:00 p.m., U.S. Time Zones. *Conscoop-Consorzia*, 62 Fed. Cl. at 221-22, 229. The Navy rejected a proposal that was submitted after 2:00 p.m., Naples time, but before 2:00 p.m. U.S. Time Zones. *Id*. at 223-24. Upholding this decision, this court observed that under the government procurement rules, "the solicitation is the controlling document for determining the submission deadline for price proposals." *Id*. at 229. In this regard, the court noted that the Competition in Contracting Act specifies that a "'solicitation for sealed bids or competitive proposals . . . shall at a minimum include . . . in the case of competitive proposals . . . the time and place for submission of proposals.'" *Id*. (quoting 10 U.S.C. § 2305(a)(2)(B)(ii)(II)). The court then rejected the claim that the solicitation's references to the agency website – which indicated that the solicitation "will 'be issued via' the website, and that the website is the 'method of distributing' solicitation amendments" – had the effect of incorporating the website's content into the solicitation, finding that "the language of the solicitation in no way suggests that the words on the web site should be read as part of the solicitation." *Conscoop-Consorzia*, 62 Fed. Cl. at 230. Presumably on the basis of these arguments, the Federal Circuit affirmed. 159 Fed. Appx. 184 (Fed. Cir. 2005).

Of course, defendant argues that *Conscoop-Consorzia* is distinguishable – and surely it *is* different, at least insofar as, there, it was defendant that strenuously argued that the deadline on the website was not part of the solicitation. *See Conscoop-Consorzia*, 62 Fed. Cl. at 229. Here, of course, the shoe is on the other foot.[30] But, the basic concepts that led the court in *Conscoop-Consorzia* to conclude that the website there was not part of the solicitation are also dispositive here, *to wit*, that: (i) under the Federal procurement system, the solicitation controls the submission deadline for proposals; and (ii) a provision in the solicitation that indicates that a website will be used for a specific purpose (*e.g.*, to distribute the solicitation, to publish amendments), will not be construed, without additional direction, to incorporate into the solicitation other information listed on the website. In the latter respect, this case is a far cry from those in which an agency made clear that the due date listed on a website had been

---

[30]  In urging the affirmance of this court's decision in *Conscoop-Consorzia*, the Justice Department argued to the Federal Circuit that this court had "correctly rejected" the notion that the website was part of the solicitation, asserting that "the web site was not part of the solicitation, and was merely a mechanism to provide access to the solicitation." Brief of Defendant-Appellee the United States at 21, *Conscoop-Consorzia FRA Corp. Di Prod. E. Lavoro v. United States*, 159 Fed. Appx. 184 (Fed. Cir. 2005) (No. 04-5150). In this regard, the Justice Department further asserted that the website's reference to "US Time Zones" "was not part of the solicitation, and merely constituted ancillary information provided by the Navy." *Id*.

incorporated into a solicitation. *See Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 225 (2008) (agency email to potential offerors indicating that the time for submitting a proposal had been extended and referring to e-Buy website as listing the new deadline); *LexisNexis, Inc.*, 2007 C.P.D. ¶ 73, at *5 (2007) (additional information incorporated into solicitation where agency "explained at length when and how it posted the amendments" via a hyperlink).  Based upon these authorities, the court concludes that defendant was right in *Conscoop-Consorzia* and is wrong here.

Accordingly, this court concludes that the deadline listed on the website did not become part of the solicitation here.

### 2.      Did plaintiff waive its timeliness claim?

In what is essentially a last ditch argument, defendant next contends that it is entitled to prevail under a waiver argument.  It asserts, in this regard, that plaintiff should be precluded from challenging the VA's rejection of its proposal because the information on the website gave rise to a patent ambiguity and LabCorp failed properly to raise that issue prior to the close of the procurement process.

Unlike protests at the GAO, the statute governing this court's bid protest jurisdiction imposes no separate time limits.  *See* 28 U.S.C. § 1491(b)(1); *but see* 28 U.S.C. § 2501. However, in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007), the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."  *See also COMINT Sys. Corp. v. United States*, 2012 WL 6062509, at *3 (Fed. Cir. Dec. 7, 2012).  This rule, however, does not preclude a party from pursuing an error that it raised with the agency prior to the close of the procurement process.  Thus, in *DGR Associates, Inc. v. United States*, 94 Fed. Cl. 189, 202-04 (2010), the court held that *Blue & Gold Fleet* was inapposite because the plaintiff had challenged the Air Force's solicitation before the closing date for receipt of proposals.  The court rejected the notion that, to avoid waiver, a protester must file either formal protest or an action in this court before the close of the bidding process.  It noted that such a view did not comport with FAR § 33.103, which indicates that that a party should attempt to resolve its concerns, if possible, by contacting the contracting officer.  *Id.* at 202-03 (citing 48 C.F.R. § 33.103).  The court held that "[t]he correct interpretation of *Blue & Gold Fleet* is that, if a party has challenged a solicitation impropriety before the close of the bidding process, the party is not precluded from later filing its protest at the Court of Federal Claims."  *DGR Assocs.*, 94 Fed. Cl. at 203; *see also Distributed Solutions, Inc. v. United States*, 104 Fed. Cl. 368, 394 (2012).

This waiver doctrine does not get defendant off the hook here for several reasons.  First, contrary to defendant's suggestion, a patent ambiguity may not be created where the solicitation itself is facially unambiguous and the only conflict that allegedly exists is between the solicitation and some ancillary source of information.  It is, of course, axiomatic that extrinsic evidence may not be used to import ambiguity into unambiguous contract language.  *See Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed. Cir. 1988); *Smelser v. United States*, 53

Fed. Cl. 530, 542 (2002); *Safeco Credit v. United States*, 44 Fed. Cl. 406, 419-20 (1999); *see also R.B. Wright Constr. Co. v. United States*, 919 F.2d 1569, 1572 (Fed. Cir. 1990). And, it stands to reason that if extrinsic evidence cannot be used to create an ambiguity that does not otherwise exist, it cannot be used to create a ***patent*** one.[31]

   This distinction finds support in numerous cases that describe the patent ambiguity doctrine as arising where a government "contract contains facially inconsistent provisions."[32] And, indeed, several cases have flatly rejected defendant's attempts to rely upon circumstances or documents outside a solicitation to create a patent ambiguity. *See, e.g.*, *Chris Berg, Inc. v. United States*, 455 F.2d 1037, 1045 (Ct. Cl. 1972) ("[I]t is not the actual knowledge of the contractor but the obviousness of the discrepancy [in the contract terms] which imposes the duty of inquiry."); *Hoppman Corp. v. United States*, 18 Cl. Ct. 220, 227 (1989) (Rader, J.) (rejecting "arguments that circumstances or documents outside the bid solicitation created, or should have flagged, a patent ambiguity," because "this court's inquiry for an ambiguity must focus on the language of the contract or bid solicitation"); *see also Ets-Hokin Corp. v. United States*, 420 F.2d 716, 722-23 (Ct. Cl. 1970); *SIPCO Servs. & Marine, Inc. v. United States*, 41 Fed. Cl. 196, 215-16 (1998); *XXX Constr. Co., Inc. v. United States*, 16 Cl. Ct. 491, 496 (1989). These cases demonstrate that there was no ambiguity here at all, let alone one patent enough to trigger the waiver rule. The relevant language of the solicitation was clear, and the webpage, in terms of its capacity to create an ambiguity, was correspondingly irrelevant.

   But, even if there were a patent ambiguity here, this hardly is a case in which LabCorp "s[a]t on [its] right[] to challenge what [it] believe[s] is an unfair solicitation." *Blue & Gold Fleet*, 492 F.3d at 1314. The record reflects that when it discovered the problem on the webpage, LabCorp immediately contacted the contracting officer and was told that the deadline in the solicitation was controlling. Given this, defendant should not be heard to argue that LabCorp failed adequately to pursue its objection to its final resolution.[33] Plaintiff's representatives made an inquiry and received a definitive answer. They did not realize that there

---

[31]   The situation might be different in a case where the patent ambiguity involves the omission of a critical term in the solicitation. But, that is not this case. Nor is this a case in which the contractor knew that the agency held an interpretation different from its own. *See HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1336-37 (Fed. Cir. 2004).

[32]   *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000); *see also M.A. Mortensen Co. v. Brownlee*, 363 F.3d 1203, 1207 (Fed. Cir. 2004).

[33]   *See Engineered Demolition, Inc. v. United States*, 70 Fed. Cl. 580, 591 n.15 (2006) (contractor fulfilled duty to inquire when it raised issue with government agency and received clarification); *Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 675 (2003) (contractor fulfilled duty to inquire when it directly asked question at pre-bid conference and the agency representative answered the question); *see also* Elizabeth D. Lauzon, "Construction and Application of Patent Ambiguity Doctrine to Government Contracts," 13 A.L.R. Fed. 2d 261 § 4 (2006) (cataloguing other cases in which a contractor fulfilled the duty to inquire); *compare Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1580 (Fed. Cir. 1993).

was still a problem until they had finished loading their proposal onto the website (which the website allowed) and then attempted to submit the proposal. It was then that they received the electronic notice that the procurement had closed. By then, it was too late for plaintiff to object further – even though its official attempted to contact the contracting officer again. Under these circumstances, this case is more akin to those in which a protester did not become aware of an alleged defect in the solicitation until after the close of bidding. In such cases, this court has consistently held that the *Blue & Gold Fleet* waiver rule is not triggered. *See, e.g.*, *Reilly v. United States*, 104 Fed. Cl. 69, 77 (2012); *Allied Materials & Equip. Co., Inc. v. United States*, 81 Fed. Cl. 448, 459-60 (2008); *Knowledge Connections, Inc. v. United States*, 79 Fed. Cl. 750, 759 (2007). And such is the case here, as well.

As there is no waiver here, the court must next determine whether the VA acted in a fashion that was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law when it refused to accept plaintiff's proposal.

### 3.    Was the VA's action in rejecting the proposal arbitrary, capricious, an abuse of discretion, or otherwise contrary to law?

As noted above, the Competition in Contracting Act specifies that a "solicitation . . . shall at a minimum include . . . in the case of competitive proposals . . . the time and place for submission of proposals." 10 U.S.C. § 2305(a)(2)(B)(ii)(II). Logic and common sense suggest that in enacting this requirement, Congress intended that agencies would accept offers that were submitted properly before the deadline specified in a solicitation. Beyond this, "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote*, 56 Fed. Cl. at 386 (discussing 10 U.S.C. § 2305); *see also Elec. Data Sys., LLC v. United States*, 93 Fed. Cl. 416, 430 (2010); *NEQ*, 88 Fed. Cl. at 47; *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207, *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). If this principle means anything, it must be that an agency may not reject, as untimely, an offer that is received prior to the deadline specified in the solicitation. Otherwise, full and open competition does not occur. *See* H.R. Rep. No. 98-1157, at 17 (1984) ("Full and open competition is accomplished only when . . . all qualified vendors are allowed . . . to submit offers on Federal procurements . . . ."); *see also Cal. Marine Cleaning, Inc. v. United States*, 42 Fed. Cl. 281, 296-97 (1998) (a bid is "timely" if it is "delivered to the place specified in an IFB on or before the time and date specified in the IFB").

Here, the solicitation indicated that offers were due by 2:00 p.m. CDT. Plaintiff attempted to submit its offer through the e-Buy website at 1:03 p.m. CDT. The offer was refused by the e-Buy system as untimely. It was not untimely.[34] Defendant's action in rejecting the

---

[34] In a startling argument, defendant suggests that plaintiff should not be heard to complain because its offer, in fact, was not delivered to the contracting officer before the 2:00 p.m. CDT deadline. In making this claim, defendant seemingly dons blinders to why that happened. In this regard, this case is reminiscent of those noting that an offer can be accepted when an agency affirmatively interfered with what would otherwise have been a timely delivery. *See, e.g.*, *White Oak Telecomm., Inc. v. Dep't of Veterans Affairs*, 94-3 B.C.A. ¶ 27258 (1994); *Network Imaging Sys. Corp. v. Dep't of Agriculture*, 94-2 B.C.A. ¶ 26883 (1994); *SYS v. Nat'l*

offer, therefore, was arbitrary, capricious, an abuse of discretion, and contrary to law.  *See, e.g.*, *BH & Assocs.*, 88-1 B.C.A. ¶ 20340 (1987).  It is beyond peradventure that this action prejudiced plaintiff – that it has suffered a "non-trivial competitive injury which can be addressed by judicial relief."  *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (quoting *WinStar Commc'ns, Inc. v. United State*s, 41 Fed. Cl. 748, 763 (1998)); *see also Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).  And it falls to this court to remedy defendant's misfeasance.[35]

### D.     Injunctive Relief

Having concluded that the instant procurement was legally flawed and that plaintiff was thereby prejudiced, the court must determine whether plaintiff has made three additional showings to warrant injunctive relief, *to wit*, that:  (i) it will suffer immediate and irreparable injury; (ii) the public interest would be better served by the relief requested; and (iii) the balance of hardships on all the parties favors plaintiff.  *Idea Int'l, Inc. v. United States*, 74 Fed. Cl. 129, 137 (2006); *Bannum*, 60 Fed. Cl. at 730; *Seattle Sec. Servs.*, 45 Fed. Cl. at 571.  No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see also Seattle Sec. Servs.*, 45 Fed. Cl. at 571.  In the instant case, the existence of irreparable injury to plaintiff, the balancing of harms in favor of the plaintiff, and the public interest all lead this court to grant injunctive relief to plaintiff.

### 1.     Irreparable Harm

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."  *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993); *see also Serco Inc. v. United States*, 81 Fed. Cl. 463, 501 (2008).  Plaintiff argues that it will suffer irreparable harm if an injunction is not granted, because the only other available relief – the potential for recovery of bid preparation costs – would not compensate it for the loss of valuable business on the contract in question.  This type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm.  *See id.* at 501-02; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed. Cl. 826, 828 (2002); *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profits has been recognized to constitute significant harm."); *Bean Dredging Corp. v. United States*, 22 Cl. Ct. 519, 524 (1991) (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").

---

*Aeronautics & Space Admin.*, 93-2 B.C.A. ¶ 25582 (1992).  It is worth noting, as an aside, that defendant has revealed that the e-Buy website is programmed so that **all** the times displayed thereon are expressed in Eastern Time, regardless of the specific time zone actually listed in a given solicitation.  That feature seemingly begs mischief.

[35]  Because this court accepts plaintiff's prime argument on this point, it need not address plaintiff's alternative arguments (*e.g.*, that the VA's conduct violated a covenant of good faith and fair dealing).

Accordingly, plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

### 2.    Balance of Hardships

Under this factor, "the court must consider whether the balance of hardships leans in the plaintiff's favor," requiring "a consideration of the harm to the government." *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715 (2006); *see also Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 78-79 (2007); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003). Defendant intimates that enjoining the performance of the blanket purchase agreement would delay implementation of a contract designed to benefit the VA's operations. But, this court has observed that "'only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests.'" *Id.* (quoting *Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 399 (1999)); *see also Serco Inc.*, 81 Fed. Cl. at 502; *Reilly's Wholesale*, 73 Fed. Cl. at 715-16. Defendant has offered no reason why this is such an exceptional case.

In suggesting that an injunction ought not be issued, defendant also asserts that allowing plaintiff to participate in this procurement would harm the offerors that submitted their offers through the e-Buy website before 2:00 p.m. EDT. It cites *Labatt Food Service, Inc. v. United States*, 577 F.3d 1375, 1381 (Fed. Cir. 2009), for the proposition that plaintiff should not be given special treatment and extra time to submit its proposal. *See also Elec. On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 162 (2012). Of course, any harm flowing to the other offerors here stems from defendant's own arbitrary and capricious actions. Moreover, none of those offerors are entitled to an award under this procurement based upon the legally erroneous exclusion of plaintiff from the competition. Finally, any *bona fide* concerns defendant has in terms of maintaining an even playing field here may be addressed via the terms of the injunction and the flexibility it will afford defendant on how to proceed.

### 3.    Public Interest

Plaintiff also contends that the public interest will be served by granting the requested preliminary injunctive relief. "Clearly, the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *PGBA*, 57 Fed. Cl. at 663; *see also Rotech Healthcare Inc. v. United States*, 71 Fed. Cl. 393, 430 (2006); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 266, 269 (1997); *Magellan*, 27 Fed. Cl. at 448. In the present case, the public's interest likewise lies in preserving the integrity of the competitive process.

## III.    CONCLUSION

Unlike someone on good terms with the Mad Hatter's Time, the officials at the VA could not whisper a hint to Time and make the clock on this procurement go round, in a twinkling, to a time different than that listed in the solicitation. There is nothing on this side of the looking glass to support the VA's rejection of plaintiff's offer. It is time, via an injunction, for defendant to return to reality.

Based on the foregoing:

1.      Plaintiff's motion for judgment on the administrative record is
        **GRANTED** and defendant's cross-motion for judgment on the
        administrative record is **DENIED**.

2.      Defendant, acting by and through the Department of Veterans Affairs, is
        hereby **ENJOINED** from evaluating quotations received, and making an
        award, under solicitation VA255-12-Q-0268, unless the Department of
        Veterans Affairs makes provision to accept a quotation from LabCorp and
        evaluate it on the same terms as other quotations already received (or amended
        quotations to be received).

3.      Alternatively, defendant, acting by and through the Department of
        Veterans Affairs, may conduct a new procurement for the services
        described in solicitation VA255-12-Q-0268.

4.      Nothing herein shall be deemed to prevent defendant and plaintiff from
        mutually agreeing to resolve this matter in such fashion as they deem
        appropriate.

5.      This opinion shall be published, as issued, after January 11, 2013, unless
        the parties identify protected and/or privileged materials subject to
        redaction prior to that date.  Any such materials shall be identified with
        specificity, both in terms of the language to be redacted and the reasons
        for each redaction (including appropriate citations to authority).

**IT IS SO ORDERED.**


                                        s/Francis M. Allegra
                                        Francis M. Allegra
                                        Judge